T.C. Memo. 1995-463


UNITED STATES TAX COURT


BRUNO AND FRANCESCA TABBI, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15863-93.     Filed September 28, 1995.


<u>Gerald J. Carnago</u>, for petitioners.

<u>Dennis G. Driscoll</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income tax and additions to tax as follows:

## Additions to Tax

| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1)(B) | Sec. 6661 |
|---|---|---|---|---|---|
| 1987 | $108,314 | $79 | $232 | [1] | $27,078 |
| 1988 | 66,102 | -- | 3,305[2] | -- | 16,526 |
| 1989 | 36,411 | 8,695 | -- | -- | -- |

| Year | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1)(B) | Sec. 6653(b) | Sec. 6662 | Sec. 6663 |
|---|---|---|---|---|---|
| 1987 | $77,762 | [3] | -- | -- | -- |
| 1988 | -- | -- | $49,576 | -- | -- |
| 1989 | -- | -- | -- | $2,304 | $19,012 |

[1] Fifty percent of the interest due on $4,632.
[2] Sec. 6653(a)(1) for 1988.
[3] Fifty percent of the interest due on $103,682.

After concessions, the issues for decision are:

(1)  Whether petitioners had unreported income of $47,068 for 1987, $87,711 for 1988, and $30,475 for 1989.  We hold that they did, except as discussed below.

(2)  Whether petitioners' unreported income is subject to self-employment tax for 1987, 1988, and 1989.  We hold that it is, except as conceded by respondent.

(3)  Whether petitioners had unreported income of $25,518 from the sale of their residence in 1988.  We hold that they did.

(4)  Whether petitioners' gains and losses from the sale of real property in 1987, 1988, and 1989 were capital or ordinary. We hold that they were ordinary.

(5)  Whether petitioners had unreported capital gains of $2,500 from the sale of their interest in Bagnasco-Tabbi Funeral Home.  We hold that they did.

(6) Whether petitioners had unreported interest income of $709 for 1987, $306 for 1988, and $379 for 1989. We hold that they did.

(7) Whether petitioners may deduct advertising, rent, office expenses, utilities and telephone, commissions, supplies, licenses and fees, dues, rental maintenance, and insurance expenses in excess of the amounts allowed by respondent. We hold that they may not, except as discussed below.

(8) Whether petitioners may carry forward a net operating loss of $1,008 for 1988. We hold that they may not.

(9) Whether petitioner Bruno Tabbi is liable for the addition to tax for fraud under section 6653(b) for 1988 and the fraud penalty under section 6663 for 1989. We hold that he is not.

(10) Whether petitioners are liable for additions to tax for: (a) Negligence under section 6653(a) for 1987 and, in the alternative to fraud, for 1988 and the negligence penalty under section 6662 for 1989; (b) substantial understatement of income tax under section 6661 for 1987 and 1988; and (c) late filing under section 6651(a)(1) for 1987 and, in the alternative to fraud, for 1989. We hold that they are liable for the additions to tax for negligence and substantial understatement of tax for 1987 and 1988, the negligence penalty for 1989, and the addition to tax for late filing for 1987, but that they are not liable for the addition to tax for late filing for 1989.

(11) Whether petitioner Francesca Tabbi qualifies as an innocent spouse under section 6013(e). We hold that she does not.

Respondent concedes that petitioners are not liable for the addition to tax for fraud for 1987, and that petitioner Francesca Tabbi is not liable for the addition to tax for fraud for 1988 and 1989.

References to petitioner husband are to Bruno Tabbi. References to petitioner wife are to Francesca (or Frances P.) Tabbi. Section references are to the Internal Revenue Code in effect for the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

1. Petitioners

Petitioners resided in Clinton Township, Michigan, when they filed the petition.

Petitioner wife worked as a secretary for her father, Salvatore LoChirco (LoChirco), at Oliver Homes, Inc. (Oliver Homes), from 1978 to 1988. She did not work in petitioner husband's office and was not involved in his real estate business.

Petitioners had two children born before 1988. Petitioners' son Antonino was born in September 1988 with severe heart problems that led to his death in August 1990. Petitioner wife

spent most of the time after Antonino was born caring for him and petitioners' two older children. Antonino was in the hospital frequently from September 1988 to April 1990. He had heart surgery in April 1990, and was hospitalized until late July. Petitioners were at the hospital with him continuously during these 4 months. Antonino died 10 days after he was discharged from the hospital.

2. <u>Petitioner Husband's Real Estate Activities</u>

Petitioner husband was a real estate broker from 1974 to 1989. Petitioners owned rental properties and investment real estate in 1987, 1988, and 1989.

Petitioner husband was also in the business of buying and selling homes through his company, Americana Investment Corp. (Americana). Because of changes in the Detroit real estate market in 1986 and 1987, petitioner husband could not sell as many houses in the years in issue as he had previously. Petitioner husband rented the houses until he could sell them, and made repairs that were necessary to keep the houses in saleable condition.

Petitioner husband conducted his real estate activities through several business entities. His business operations were disorganized. He did not keep good records. He intermingled assets and funds between his many business and personal bank accounts, and he was thinly capitalized and overextended in credit. Because of his disorganization and lack of records, he

did not know and could not accurately reconstruct his income for the years in issue.

a. 1987

In 1987, petitioner husband owned and was president of Americana, a Michigan corporation that used investments to buy certificates of deposit (CD's) and then borrow against them. He used the loan proceeds to buy, sell, and manage residential real estate for investors. Many of Americana's investors were friends and relatives of petitioner husband's family. Americana promised its investors a high rate (i.e., 17 percent) of return. It reported gross sales of homes of $140,718.05 and a $31,149.26 loss for 1987. Americana went out of business in 1987.

In 1987, petitioner husband was a real estate broker and operated rental properties for B.R. Tabbi, Inc., d.b.a. Earl Kiem Realty Bell/Shores Realty, Inc., a Michigan corporation; BRT Mortgage Co. (BRT); and Canta Building Co. (Canta). Petitioner husband was president of Earl Kiem Realty. He sold $116,595 of real property in 1987.

b. 1988

Petitioner husband was a real estate broker and operated rental properties for Canta in 1988. He sold $27,847 of real property in 1988.

c. 1989

Petitioner husband was a real estate broker and operated rental properties in 1989 for Canta, Premiere Financial Services

(Premiere), Homeowners Direct Co. (Homeowners), and La Terra Real Estate (La Terra), d.b.a. Soldi Real Estate Co. (Soldi). La Terra was a Michigan corporation owned by petitioner husband, Anthony Duronio, and Joseph Ancona. Petitioner husband owned one-third of La Terra's stock. La Terra's shareholders and nonshareholder employees earned commissions from real estate sales. Each salesperson contributed his or her share of expenses to La Terra. LaTerra's shareholders did not share equally in La Terra's income and were not paid for being shareholders or officers. La Terra leased an office at 38600 Van Dyke, Sterling Heights, Michigan.

On February 7, 1989, petitioner husband incorporated Premiere in Nevada. Petitioner husband was the president of Premiere.

On April 7, 1989, petitioner husband incorporated Canta in Delaware. Petitioner husband was the president, and petitioner wife was the secretary of Canta.

Petitioner husband sold $42,400 of real property in 1989.

3.  Petitioner Husband's Bankruptcy

On December 2, 1987, petitioner husband filed for bankruptcy under chapter 7 of the U.S. Bankruptcy Code in the U.S. Bankruptcy Court for the Eastern District of Michigan. Petitioner husband was granted a discharge under chapter 7 on March 9, 1988. Petitioner husband's creditors pressed him for payment, both before and after his discharge in bankruptcy.

4.  Americana

Before and during the years in issue, petitioner husband transferred real estate without consideration from petitioners to Americana, and from Americana to petitioners.  During the years in issue, petitioner husband deposited rental and installment sales income from real estate owned by Americana to the Earl Kiem Bell/Shores escrow account, which petitioner husband controlled.

In 1987, petitioner husband transferred $9,800 to Americana's account.  Petitioner husband liquidated Americana in 1987.  At that time, he distributed its assets, including financial investments and real estate to himself and assumed its liabilities.  In 1987, petitioners paid various expenses relating to real estate owned by petitioners and/or Americana.

From 1987 to 1989, petitioner husband obtained second mortgages on, and rented, real properties owned by petitioners and/or Americana.  At the same time, he sold parcels of real estate that were owned by petitioners and/or Americana in 1987, 1988, and 1989.  He sold five houses in 1987, three in 1988, and two in 1989.  Also in those years, petitioner husband used funds invested in Americana to buy real estate for Americana.

Petitioners earned interest of $259 in 1987, $306 in 1988, and $379 in 1989.

5.  Petitioners' Bank Accounts and Investments

    a.   Overview

Petitioner husband used the following personal and corporate bank accounts in the years at issue:

| Account | Bank | 1987 | 1988 | 1989 |
|---|---|---|---|---|
| Frances P. Tabbi | Comerica | X | X | |
| Frances P. Tabbi | Comerica | X | X | |
| Frances P. Tabbi | Comerica | X | | |
| Frances P. Tabbi or Bruno Tabbi ITF Bruno Tabbi, Jr. | Comerica | X | | |
| Frances Tabbi ITF Bruno Tabbi, Jr. & Paulette M. Tabbi | Comerica | | X | |
| Bruno Tabbi | First State Bank | X | | |
| Canta | Manufacturers | X | X | X |
| Canta | Wilmington Trust (a Delaware bank) | | | X |
| Earl Kiem Realty escrow | First State Bank | X | | |
| BRT | First State Bank | X | | |
| Americana | First State Bank | X | | |
| Premiere | First Interstate (a Nevada bank) | | | X |
| Homeowners | Manufacturers | | | X |

    b.   1987

Petitioner husband signed the signature card for the BRT account.  He was listed as president and petitioner wife was

listed as secretary of Americana on its account. Petitioner husband signed petitioner wife's name on the signature card for the Americana account. Petitioner husband used his Social Security number on the BRT and Canta business accounts for the years in issue.

Petitioner husband deposited the following amounts in 1987:

| Account | Type of Income | Amount |
|---|---|---|
| Petitioner wife | commissions | $3,534.74 |
| Petitioner wife | other | 4,500.00 |
| BRT | commissions | 34,103.96 |
| BRT | refunds | 724.31 |
| BRT | other | 3,052.00 |
| Canta | commissions | 680.00 |
| Canta | refunds | 133.95 |
| Canta | other | 462.50 |
| Americana | other[1] | 11,502.38 |

Petitioner husband had $32,598.70 of commissions,[2] $858.26 of refund income,[3] and $19,517 of other income in 1987. Petitioners reported income of $29,522 from petitioner husband's real estate activities for 1987.

Petitioner husband deposited the following amounts in the Earl Kiem Bell/Shores escrow account in 1987:

_____

[1] Americana deposited in its checking account $11,502.38, reflecting the net proceeds from cashing CD's of $80,002.38, and replacing them with CD's of $68,500.

[2] Petitioner husband deposited $38,318.70 in commissions; however, we subtracted $4,875 of land contract payments and $845 of transfers between bank accounts in figuring his commission income for 1987.

[3] Petitioner husband received refunds of certain business expenses, such as insurance and utilities, that he deposited in his various accounts.

| Amount | Source of funds |
|---|---|
| $50,002.78 | Americana |
| 30,268.57 | sale of real estate owned by petitioners and/or Americana |
| 7,229.75 | petitioner husband's income |
| 1,907.00 | installment income from sale of real estate |
| 2,707.00 | Schedule E rental income |
| 3,110.00 | petitioners' bank accounts |

Total:  $95,225.10

Petitioner husband used $53,265.84 from the escrow account in 1987 to pay petitioners' personal expenses and expenses relating to various real properties owned by petitioners and/or Americana.

Petitioner husband made several deposits of currency of more than $100 in 1987.

Petitioner husband deposited income he earned in 1987 and 1988 in bank accounts in petitioner wife's name.  She used these bank accounts to pay personal and household expenses.

c.    1988

Petitioner husband earned commissions of $14,621.84 in 1988 from the sale of two residences in Rochester, Michigan. Petitioner husband cashed the two commission checks at the East Side Market, and deposited the cash.  Petitioner husband made several other large (i.e., more than $1,000) deposits of currency in 1988.

Petitioner husband deposited the following amounts in 1988:

| Account | Type of Income | Amount |
|---|---|---|
| Petitioner wife | commissions | $7,888.00 |
| Petitioner wife | other | 4,651.58 |
| Canta | commissions | 69,242.26 |
| Canta | refunds | 403.50 |

| | | |
|---|---|---|
| Canta | other | 2,488.30 |
| unknown | commissions | 14,621.84 |

Petitioner husband had real estate commissions of $91,752, refunds of $404, and other income of $7,180 in 1988. Petitioners reported income of $15,480 from petitioner husband's real estate activities for 1988.

d. 1989

Petitioner husband deposited his real estate commissions in the bank accounts of Canta, Premiere, and Homeowners. He routinely transferred funds between the Canta and Premiere corporate accounts and the Canta and Homeowners noncorporate accounts in 1989. Petitioner husband routinely used funds from the Canta and Premiere corporate accounts to pay petitioners' personal living expenses.

Petitioner husband deposited $23,425 of Soldi's commission checks from various title companies in accounts which he controlled. Soldi had not recorded those payments on its books.

Petitioner husband deposited the following amounts in 1989:

| Account | Type of Income | Amount |
|---|---|---|
| Canta | commissions | $30,285.62[4] |
| Canta | other | 150.00 |
| Premiere | commissions | 25,989.49[5] |

---

[4] This includes $12,508 of Soldi's funds petitioner husband deposited in Canta's Manufacturers account.

[5] This includes $3,929.49 of Soldi's funds petitioner husband deposited in the Premiere account.

| Canta II | commissions | 21,826.42[6] |
|----------|-------------|--------------|
| Canta II | refunds | 481.05 |
| Homeowners | commissions | 1,395.00 |

Petitioner husband deposited no commission checks in petitioner wife's accounts in 1989. However, he or one of the other Soldi shareholders wrote checks to petitioner wife on Soldi's bank account totaling $4,148.29 in 1989.

Petitioner husband had real estate commissions of $79,496 (including $23,425 of Soldi's funds which petitioner husband deposited in accounts which he controlled), refunds of $481.05, and other income of $150 in 1989. Petitioners reported that they had income of $49,652 from petitioner husband's real estate activities for 1989.

## 6. Petitioner Husband's Payments to Clients and Investors

On October 16, 1986, petitioner husband was the agent for Christoforo and Jacqueline Mazzola at a real estate closing on 42407 Jo-Ed, Sterling Heights, Michigan. As their agent, he received $79,129 at the closing. Petitioner husband deposited the $79,129 in Americana's bank account. In 1987, petitioner husband borrowed $42,186 from his parents, Richard and Elvera Tabbi, to pay the Mazzolas. He paid the Mazzolas (or Olympia Homes on the Mazzolas' behalf) $46,387 from the Earl Kiem Realty Bell/Shores escrow account in 1987 and $35,395 from Canta in 1988.

_____

[6] This includes $6,988 of Soldi's funds petitioner husband deposited in Canta's Wilmington Trust account.

Petitioner husband reimbursed investors in Americana for their investments in 1987, 1988, and 1989.  He paid them $3,725 in 1987, $1,800 in 1988, and $6,370 in 1989.

Petitioners refunded a deposit of $1,287 to two former clients, Robert and Charlene Graham, which they paid for the sale of a home at 16711 Lincoln, East Detroit, Michigan.

On November 24, 1987, petitioner husband borrowed $8,700 from Comerica Bank to pay investors and business expenses.  In December 1987, petitioner husband borrowed $32,000 from his parents to pay investors and business expenses.

7.   The Bagnasco-Tabbi Funeral Home

Petitioner husband owned an interest in the Madison Funeral Home Corp., which operated the Bagnasco-Tabbi Funeral Home in 1987.  He sold his interest in 1987 for 11 funeral certificates (worth about $5,000 each) and 30 months of health insurance (worth $2,500).

8.   Petitioners' Residence

Oliver Homes, a Michigan corporation wholly owned by LoChirco, bought a lot at 200 Tanglewood, Rochester Hills, Michigan, for $19,500 from Biltmore Properties on December 20, 1977.  On January 28, 1985, Oliver Homes conveyed the lot to petitioner wife. Petitioner wife did not pay for the lot.  On March 4, 1987, petitioner wife conveyed the lot for no charge to Oliver Homes, and Oliver Homes built a house on the lot.  Oliver Homes then sold the house to petitioner wife for $175,921.

Petitioners lived in the Tanglewood home in 1987 and 1988. Petitioners spent $15,000 to improve that home while petitioner wife owned it. On August 2, 1988, petitioner wife sold it for $237,000. Petitioner wife had sales expenses of $561. Her cost basis in the house was $210,691.

On February 22, 1989, petitioner wife bought a lot at 41741 Alden, Clinton Township, Michigan, for $35,000. Canta built a residence on this lot in 1989. Petitioner wife bought the residence on October 12, 1989, for $160,000.

9.    Petitioners' Returns

H & R Block prepared petitioners' 1987 and 1988 returns. Petitioner husband gave H & R Block various documents to prepare those returns. For the 1988 Schedule C, he gave H & R Block only his real estate commission receipts totaling $15,480 as shown on a Form 1099. He did not give them records of commission checks that he cashed before depositing, records of corporate payment of petitioners' personal expenses, or records of commissions petitioner husband received that were payable to another entity.

Petitioners did not review the returns before signing them. They did not claim all of their exemptions for 1987.

Gerald Carnago, of Carnago, Neddermeyer & Bringard, prepared petitioners' 1989 return. Petitioners filed their returns for 1987 on April 25, 1988, for 1988 on September 5, 1989, and for 1989 on October 23, 1990.

Petitioner husband did not keep books and records (other than checks) for his businesses from 1987 to 1989. He used accountants to keep his books, balance his checking accounts, and prepare returns from 1974 to 1986. He could not afford to use accountants after 1986 because his business declined.

Petitioners reported on their 1988 and 1989 returns that they owned several real properties that Americana formerly owned: 11420 Nashville, 14509 Mayfield, and 9550 Whittier.

## 10. Respondent's Examination

Respondent's revenue agents reconstructed petitioners' income for 1987, 1988, and 1989 using the bank deposits plus expenditures method. Revenue Agent Martin interviewed petitioner husband on May 29 and October 23, 1990, and on September 17, 1991. Petitioner husband cooperated with Revenue Agent Martin and Revenue Agent Andrews' investigation. He gave the agents his checks, which were his only records of the transactions. He did not make misleading statements to, or give misleading documents to, respondent's agents.

The revenue agents identified all bank accounts for which petitioners had signatory authority during the years in issue, and obtained signature cards, monthly statements, canceled checks, deposits slips, and deposit items for these accounts. The agents analyzed the deposits made to these accounts, and excluded all deposits that the agents believed were nontaxable, including transfers between accounts. The agents also obtained

other documents, such as real estate closing statements, to identify income from real estate commissions, rents, refunds, and other sources.  The agents concluded that petitioners had income in 1987 from petitioner husband's use of the Earl Kiem Bell/Shores escrow account to pay petitioners' personal living expenses.

11.  Petitioners' Unreported Income

Petitioners had unreported income of $35,566 in 1987, $87,711 in 1988, and $30,475 in 1989.

Petitioners had gains from real estate sales of $5,595 for 1987, and losses of $19,759 for 1988 and $832 for 1989.  They had net gains of $5,595 for 1987, and net losses of $19,759 for 1988 and $520 for 1989.

Petitioners underreported their capital loss by $12,080 in 1987 and overreported capital gain by $12,377 in 1988.  They had a net loss of $63,165 in 1987 and a net gain of $474 in 1988, excluding capital gain from the sale of their interests in the Bagnasco-Tabbi Funeral Home and Americana.

OPINION

1.  Respondent's Use of the Bank Deposits Method

Respondent used the bank deposits plus expenditures method to determine petitioner's income for the years in issue.[7]  If a

_____

[7] Respondent determined petitioners' income from the escrow account by computing disbursements as income less any funds petitioner husband deposited in the account.

taxpayer does not maintain adequate books and records, respondent may reconstruct a taxpayer's income by any reasonable method which clearly reflects income. Sec. 446; Holland v. United States, 348 U.S. 121, 130-132 (1954). The bank deposits method has long been approved by the courts as a method for computing income. Estate of Mason v. Commissioner, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977). Bank deposits are prima facie evidence of income. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986); Estate of Mason v. Commissioner, supra at 656-657.[8]

Respondent's determination is presumed to be correct, and petitioners bear the burden of proving otherwise. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Petitioners must overcome the presumption as to each item of unreported income in respondent's deficiency determination. Foster v. Commissioner, 391 F.2d 727, 735 (4th Cir. 1968), affg. in part, revg. in part on other grounds T.C. Memo. 1965-246.

Petitioners argue that respondent erred in including in their income for 1987: $11,502 from Americana's bank account, $23,615[9] from petitioner husband's use of the Earl Kiem escrow

---

[8] Respondent concedes that petitioners are not liable for tax on other income items of $100 for 1987 and $144 for 1988.

[9] Respondent calculated that petitioners had taxable income of $23,615 from their personal use of funds in the Earl Kiem escrow account as follows:

(continued...)

account, $858 of refunds received by petitioner husband, and $8,015 of other income.

Petitioners contend that respondent improperly reallocated income from Americana to petitioners in disregard of section 482 by claiming that Americana was the alter ego of petitioner husband. Similarly, petitioners argue that respondent improperly

---

[9](...continued)

Checks written on escrow account:

| | |
|---|---|
| Checks for personal expenses and real estate | $53,265.84 |
| Checks to/for benefit of Mazzolas | 46,387.00 |
| Checks to Charlene Graham | 1,287.00 |
| Total checks: | 100,939.84 |

Petitioners' basis in account:

Americana funds

| | |
|---|---|
| Americana funds deposited to account | $50,002.78 |
| Payments to/for Mazzolas | 46,387.00 |
| | 3,615.78 |

Petitioners' funds

| | |
|---|---|
| Installment income from real estate sales | $1,907.00 |
| Rental income deposited to account | 2,707.00 |
| Transfers | 3,110.00 |
| Income from real estate sales | 13,788.38 |
| Funds from other sources | 7,229.75 |
| | 28,742.13 |

Total: 32,357.91

Funds for petitioners' benefit:

| | |
|---|---|
| Rental income deposited to account | $2,707.00 |
| Checks written for petitioners' benefit | 53,265.80 |
| Total: | 55,972.80 |

Taxable income from account:

| | |
|---|---|
| Funds for petitioners' benefit | $55,972.80 |
| Petitioners' basis in account | 32,357.91 |
| | 23,614.89 |

reallocated income from the Earl Kiem escrow account to petitioners under section 482. However, respondent did not reallocate income to petitioners from Americana or the Earl Kiem escrow account under section 482.

Respondent argues that petitioners are taxable on Americana's income because petitioner husband improperly converted Americana's assets to his control and intermingled his financial affairs with those of Americana such that Americana became his alter ego. We disagree. Respondent cited no authority for us to apply the alter ego theory in these circumstances. We do not apply an alter ego theory to reallocate income from Americana to petitioners because Americana engaged in bona fide business activities and was a separate taxable entity. Jackson v. Commissioner, 233 F.2d 289, 291 (2d Cir. 1956), affg. 24 T.C. 1 (1955); Paymer v. Commissioner, 150 F.2d 334, 336-337 (2d Cir. 1945) (income from property taxed to stockholders, rather than the corporation, only if the corporation is a dummy or sham or is used for tax avoidance purposes). As discussed below infra par. 9, petitioner husband did not fraudulently divert corporate funds from Americana. Cf. Ruidoso Racing Association, Inc. v. Commissioner, 476 F.2d 502, 506 (10th Cir. 1973), affg. in part and revg. and remanding in part T.C. Memo. 1971-194; Moore v. Commissioner, T.C. Memo. 1977-275, affd. 619 F.2d 619 (6th Cir. 1980) (corporation's dominant shareholder fraudulently diverted corporate funds for personal use and so

controlled the corporation that the corporate entity was destroyed and the corporation became the individual's alter ego). Thus, we do not include $11,502 from Americana's account in petitioners' income for 1987.

Petitioners contend that respondent must establish that Americana and the Earl Kiem escrow account had sufficient earnings and profits before respondent attributes income (i.e., constructive dividends) to petitioners. We disagree. Petitioner husband controlled the deposits in the Earl Kiem escrow account, and used those funds to pay petitioners' personal expenses and petitioners' real property expenses. When a corporation pays a nondeductible personal expense of its sole shareholder, or permits a shareholder to use corporate property for a personal purpose, the shareholder receives a constructive dividend to the extent the corporation's earnings and profits provide personal benefit to the shareholder. Secs. 301, 316; Falsetti v. Commissioner, 85 T.C. 332, 356-357 (1985); Henry Schwartz Corp. v. Commissioner, 60 T.C. 728, 744 (1973). Petitioners bear the burden of proving that Americana and the Earl Kiem escrow account had insufficient earnings and profits to support the constructive dividend treatment. Hagaman v. Commissioner, 958 F.2d 684, 695 n.16 (6th Cir. 1992), affg. and remanding T.C. Memo. 1987-594; United States v. Leonard, 524 F.2d 1076, 1083 (2d Cir. 1975); Truesdell v. Commissioner, 89 T.C. 1280, 1295-1296 (1987). Petitioners have not carried their burden.

Petitioners argue that for 1988 respondent erred in reconstructing their income,[10] and in including in income refunds of $404 and other income of $7,036. For 1989, petitioners argue that respondent erred in including in income refunds from Lucido Insurance Agency of $481.05, and as other income a check from Michael Larco for $150 because it was a loan repayment.

Petitioners have failed to prove that the disputed items for 1987, 1988, and 1989 were nontaxable. Refunds petitioner husband received are includable in petitioners' income because they were refunds for various items, such as insurance and utilities, that petitioner husband deducted as business expenses. Petitioners have not proved that cash deposits they made, several of which exceeded $1,000, were from a nontaxable source. Petitioners did not show that the payment from Larco was repayment of a loan.

Petitioners have failed to prove that respondent erred by including in income for 1987 petitioners' use of the Earl Kiem escrow account to pay personal expenses and their real property expenses of $23,615. Sec. 301; Falsetti v. Commissioner, supra; Henry Schwartz Corp. v. Commissioner, supra. However, as stated above, we do not treat funds deposited to Americana's account as income taxable to petitioners. We sustain respondent's calculation of petitioners' unreported income for 1987, 1988, and 1989, except for the inclusion of the Americana funds in 1987.

---

[10] Petitioners incorrectly omitted installment sales of $9,017 from their calculation of their income for 1988.

2. Self-Employment Taxes

Respondent determined that petitioners are liable for self-employment taxes under section 1401 for 1987, 1988, and 1989. Section 1401 imposes a tax on a taxpayer's self-employment income. "Self-employment income" includes the net earnings from self-employment derived by an individual during the taxable year. Sec. 1402(b). Net earnings from self-employment income means gross income, less certain deductions, derived by an individual from any trade or business carried on by such individual. Sec. 1402(a).

Respondent concedes that petitioners are not liable for self-employment tax for 1987 on $23,615 attributed to them from their personal use of Earl Kiem Bell/Shores escrow account funds, and $11,502 from Americana's bank account.

Petitioners bear the burden of proving that they are not liable for the taxes imposed by section 1401. Rule 142(a). Petitioners concede that they are liable for self-employment tax on their real estate income less business deductions. They argue, however, that they are not liable for self-employment tax on other amounts on the theory that they did not receive those amounts, or if received, that those amounts were nontaxable gifts or loan repayments. Petitioners also argue that petitioner husband is not liable for self-employment tax on the income he earned as a real estate dealer selling and renting houses he held for sale primarily to customers. Sec. 1402(a)(1).

We held above that petitioners failed to prove that they did not have unreported income in the amounts asserted by respondent. They have not proven that they did not receive that income, nor have they proven that it is not subject to self-employment tax. Petitioner husband received refunds for items, such as insurance and utilities, that he deducted as business expenses. The refunds are includable in petitioners' income and are subject to self-employment tax.

An individual who is engaged in the business of selling real estate to customers may be classified as a real estate dealer. Sec. 1.1402(a)-4(a), Income Tax Regs. Rentals from real estate and the related deductions are excluded from net earnings subject to self-employment tax unless the rentals are received in the course of a taxpayer's trade or business as a real estate dealer. Sec. 1402(a)(1); Hopper v. Commissioner, 94 T.C. 542, 545 (1990); sec. 1.1402(a)-4(a), Income Tax Regs.

Whether property is held by a taxpayer for investment or for sale to customers in the ordinary course of his trade or business is a question of fact. Cottle v. Commissioner, 89 T.C. 467, 486 (1987); Daugherty v. Commissioner, 78 T.C. 623, 628 (1982). As discussed below, we hold that petitioner husband was a dealer in real estate. Thus, the rentals are subject to self-employment tax. Sec. 1402(a)(1); Rockwell v. Commissioner, T.C. Memo. 1972-133, affd. 512 F.2d 882 (9th Cir. 1975). Petitioners have failed

to prove that they are not liable for self-employment tax except as conceded by respondent.

3. <u>Unreported Income From the Sale of Petitioners' Residence</u>

The parties dispute the basis of the lot Oliver Homes gave to petitioner wife. Respondent contends that the lot has a zero basis; petitioners contend that the basis of the lot is $19,500, which was the cost of the lot to Oliver Homes. Taxpayers bear the burden of proving their basis in the lot. Rule 142(a).

A taxpayer who acquires property by gift takes a basis in the property equal to the lesser of the donor's basis or the fair market value. Sec. 1015. Respondent argues that petitioner wife had no basis in the lot because her father, LoChirco, misappropriated it from Oliver Homes. Respondent argues that because transactions within a family group are subject to special scrutiny, <u>Fitz Gibbon v. Commissioner</u>, 19 T.C. 78, 84 (1952), and because LoChirco was petitioner wife's father, his failure to pay Oliver Homes for the lot before Oliver Homes conveyed it to his daughter should be treated as a constructive dividend to him, followed by a gift of the lot from him to her. Respondent asserts that petitioners did not show that LoChirco recognized a constructive dividend on the transfer of the lot, and that therefore he had no basis in the lot when Oliver Homes conveyed it to petitioner wife. <u>Commissioner v. Farren</u>, 82 F.2d 141, 143-144 (10th Cir. 1936); <u>Crane v. Commissioner</u>, 68 F.2d 640 (1st Cir. 1934), affg. 27 B.T.A. 360 (1932). Respondent contends

that, under section 1015, petitioner wife had no basis in the lot.

Petitioners argue that under section 301, a distribution to LoChirco was taxable to him at the lot's fair market value. Revenue Agent Rizzardi used $10,000 as LoChirco's basis for the lot, and concluded that LoChirco realized a constructive dividend because Oliver Homes built petitioners' home on the lot. Petitioners contend that petitioner wife's basis in the lot was the amount Oliver Homes paid for it, namely $19,500, or, in the alternative, the amount accepted by Agent Rizzardi in his audit of the LoChircos, $10,000. Petitioners argue that their gain on the sale of their home should be reduced accordingly.

Petitioners have not proven that LoChirco realized a constructive dividend when Oliver Homes distributed the lot to him. See Loftin & Woodard, Inc. v. United States, 577 F.2d 1206, 1242 (5th Cir. 1978); Goldstein v. Commissioner, 298 F.2d 562, 566 (9th Cir. 1962), affg. T.C. Memo. 1960-276; Melvin v. Commissioner, 88 T.C. 63, 79-80 (1987), affd. per curiam 894 F.2d 1072 (9th Cir. 1990). Also, petitioners have not established the fair market value of the lot when Oliver Homes distributed it to LoChirco. Sec. 301(b). We hold that petitioner wife's basis in the lot was zero.

4. Capital or Ordinary Income and Loss

Petitioners argue that the character of the gains and losses from petitioner husband's sale of real estate in the years at

issue was ordinary and not capital because he held the real estate primarily for sale to customers in the ordinary course of business. Sec. 1221(1); Suburban Realty Co. v. United States, 615 F.2d 171, 174 (5th Cir. 1980); Biedenharn Realty Co. v. United States, 526 F.2d 409, 415 (5th Cir. 1976).

Section 1221(1) excludes from capital asset classification--

stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * *

The function of section 1221(1) is "to differentiate between 'profits and losses arising from the everyday operation of a business' * * * and 'the realization of appreciation in value accrued over a substantial period of time'". Malat v. Riddell, 383 U.S. 569, 572 (1966). "Primarily" means "principally" or "of first importance". Malat v. Riddell, supra.

Whether property is held by a taxpayer "primarily for sale to customers in the ordinary course of * * * business" is a question of fact. S & H, Inc. v. Commissioner, 78 T.C. 234, 242 (1982). Courts consider numerous factors in deciding this issue, and no one factor is controlling. Biedenharn Realty Co. v. United States, supra at 415. Petitioner bears the burden of proving that his property was not so held. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The following factors indicate that petitioner husband held the houses primarily for sale to customers in the ordinary course

of business: (a) The frequency and regularity of sales; (b) the substantiality of sales; (c) the nature and extent of the taxpayer's business; (d) the purpose for which the taxpayer acquired and held the property before sale; (e) the extent of the taxpayer's sales efforts by advertising or otherwise; and (f) the extent of improvements to the property made by the taxpayer. Byram v. United States, 705 F.2d 1418, 1424 (5th Cir. 1983); United States v. Winthrop, 417 F.2d 905, 910 (5th Cir. 1969); Ross v. Commissioner, 227 F.2d 265 (5th Cir. 1955), revg. T.C. Memo. 1954-177; Goldberg v. Commissioner; 223 F.2d 709 (5th Cir. 1955), revg. 22 T.C. 533 (1954); Guardian Indus. Corp. v. Commissioner, 97 T.C. 308, 316-317 (1991), affd. without published opinion 21 F.3d 427 (6th Cir. 1994).

Before the years at issue, petitioner husband sold properties regularly and frequently. For example, he sold 16 of the 17 properties he acquired personally or from Americana in earlier years. Petitioner husband actively advertised the houses for sale and made substantial efforts to sell them. See Norris v. Commissioner, T.C. Memo. 1986-151 (taxpayer's extensive solicitation and advertising efforts and use of time and energy for real estate pursuits show that real estate was not held for investment). Petitioner husband made necessary repairs to keep the houses in saleable condition. See Norris v. Commissioner, supra. These factors suggest that petitioner husband held these houses for sale to customers.

Because of the downturn in the Detroit residential real estate market in 1987, petitioner husband did not sell as many houses. He sold five houses for $116,595 in 1987, three for $27,847 in 1988, and two for $42,400 in 1989. To cut costs, he rented properties that he did not sell immediately. The rents paid his carrying costs, such as mortgage payments, utilities, and property taxes. Cf. Baris v. Commissioner, T.C. Memo. 1965-182 (gain on sale of rental property held for sale to customers taxed as ordinary income; rental income deemed incidental). Under these circumstances, we do not believe the infrequency of petitioner husband's sales shows that he held the property for investment rather than for sale. Suburban Realty Co. v. United States, supra at 174; Biedenharn Realty Co. v. United States, supra at 411-412; United States v. Winthrop, supra at 907. We hold that petitioner husband held the houses for sale to customers.

5. Petitioners' Gains and Losses From Other Investments

Petitioners underreported their capital loss by $12,080 for a net loss of $63,165 in 1987 and overreported capital gain by $12,377 for a net gain of $474 in 1988, excluding capital gain from the sale of their interests in the Bagnasco-Tabbi Funeral Home and Americana.

Petitioners concede that they had capital gain of $2,500 in 1987 on their receipt of 24 months of medical insurance coverage for their interest in Bagnasco-Tabbi Funeral Home. Petitioners

argue that they had a $33,809 ordinary loss and a $13,278 capital loss in 1987 from their investment in Americana.  In the alternative, they argue that they had a $47,087 capital loss in 1987.

Gain or loss upon the disposition of an asset is computed by comparing the amount received with the taxpayer's basis in the asset.  Secs. 1001, 1011.  Petitioners failed to prove their basis in Americana.  Petitioners contend that their total investment in Americana was $50,702 ($9,800 that petitioner husband deposited in Americana's account, plus $5,000 paid for capital stock, $500 loaned to Americana, and $35,402 for amounts petitioner husband paid the Mazzolas), minus $3,615 credited by respondent for petitioners' basis in Americana, for a net investment of $47,087.  There is no evidence to support petitioners' position, e.g., no canceled checks.  Their only evidence of their investment in the corporation was a listing of $5,000 in capital stock, and loans from stockholders of $499.71 on Americana's 1986 return and $459.99 on its 1987 return.  This evidence is not sufficient to substantiate their basis in Americana.  Cf. Wilkinson v. Commissioner, 71 T.C. 633, 639 (1979); Halle v. Commissioner, 7 T.C. 245, 249-250 (1946), affd. 175 F.2d 500 (2d Cir. 1949).

Petitioners claim that they may deduct business interest of $2,660 for payments to the Mazzolas, and Americana's net

operating loss of $31,149.29 for 1987.  They claim $13,277.71 as a capital loss in 1987.

We disagree.  Petitioners are not entitled to basis in Americana for petitioner husband's deposit of $9,800 into its account because petitioner husband did not prove that this was a true investment of funds in Americana; instead, it was an instance of petitioner husband's moving funds between accounts. Petitioners did not offer any evidence showing that the $2,660 petitioner husband paid to the Mazzolas was interest.  Also, petitioners have not established the value of the assets they received from Americana when it liquidated.  Petitioners have not proven the amount of their basis in Americana, or that they may deduct the business interest or net operating loss in the amounts claimed.  Thus, petitioners may not deduct a capital or ordinary loss upon Americana's liquidation.

6.  Unreported Interest Income

Gross income means all income from whatever source derived, including dividends and interest.  Sec. 61(a).

Petitioners argue that respondent erred in attributing interest income from Americana's bank account in 1987, 1988, and 1989, to petitioners.  They contend that interest earned on Americana's account went directly into the account and was not used by petitioners.  Petitioners argue that a withdrawal of funds from a closely held corporation is a dividend to the recipient-shareholder to the extent of the corporation's

earnings.  See Halpern v. Commissioner, T.C. Memo. 1982-31 (controlling shareholder who diverts income from corporation receives taxable dividend to the extent of the corporate earnings and profits).  Petitioners argue that Americana had no earnings or retained earnings in 1986 or 1987, and that therefore the interest is not income to them.

Petitioners' contention that respondent must show that Americana had sufficient earnings and profits to reallocate interest income to petitioners is erroneous.  Petitioner husband acquired ownership of Americana's assets when it liquidated and went out of business in 1987.  The interest earned during 1987, 1988, and 1989 on assets in the bank account that formerly belonged to Americana is therefore taxable to petitioner husband. We sustain respondent's determination.

7.  Deductions

A taxpayer may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business.  Sec. 162(a).  Personal living expenses generally are not deductible.  Sec. 262.  Deductions are a matter of legislative grace, and taxpayers bear the burden of proving that they are entitled to any deductions claimed on their returns. Rule 142(a); Deputy v. DuPont, 308 U.S. 488, 493 (1940); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Petitioners claimed Schedules A, C, and E deductions for each of the years in issue. Respondent disallowed some of these deductions because the Earl Kiem Bell/Shores escrow account, rather than petitioners, paid the expenses. Respondent disallowed others because petitioners failed to substantiate that the expenses had a business purpose.[11]

Petitioners argue that they substantiated their business deductions with canceled checks and through petitioner husband's testimony about the purpose of the checks.

Petitioners contend that the legal and professional fees they paid in 1987 are deductible on Schedule C, not Schedule A, as determined by respondent. Petitioner husband spent $6,500 in legal fees relating to his bankruptcy resulting from his and Americana's business failure. Petitioners argue that the legal fees are a Schedule C deduction under the origin of the claim doctrine. United States v. Gilmore, 372 U.S. 39, 48 (1963); Dowd v. Commissioner, 68 T.C. 294, 303-304 (1977).

In Dowd v. Commissioner, supra, we relied on the origin of the claim doctrine in deciding that business expenses of a bankrupt taxpayer were deductible under section 162(a). Since

---

[11] Respondent concedes that petitioners may deduct for 1987, advertising expenses of $140.13, office expenses of $488.31, licenses and fees of $279.96, dues of $41, rental maintenance of $684.70, and insurance expenses of $759; for 1988, office expenses of $643.19, rental maintenance of $346, rental insurance of $198, and Schedule C rental expenses of $6,832.85; and for 1989, advertising of $135, and rental insurance of $197. Respondent also concedes that petitioners may deduct a charitable contribution of $50 to the Salvation Army for 1989.

petitioner husband's business failure with Americana caused his bankruptcy, legal fees paid to file his bankruptcy petition originated with his business. We hold that petitioners may deduct on Schedule C legal fees of $6,500 caused by his business failure. Dowd v. Commissioner, supra at 304.

Petitioners argue that their payments to Americana investors of $3,725 in 1987, $1,800 in 1988, and $6,370 in 1989 are deductible on Schedule C as ordinary and necessary business expenses.

Respondent argues that the payments to the Americana investors are deductible on Schedule A because Americana's activities were not a trade or business of petitioner husband. Many of the investors were friends of petitioner husband's family. Respondent argues that petitioner husband's claim that he paid investors to protect his own business reputation are self-serving. Respondent argues that no evidence suggests that petitioner husband's financial problems with these investors would affect his reputation as a real estate broker.

We disagree. We find that he carried his burden of proof in this respect. Petitioners may deduct on Schedule C the payments to the Americana investors.

Petitioners paid income tax return preparers' fees of $872 to H & R Block in 1988. Petitioner husband argues that since he was a sole proprietor, he may deduct the return preparation fees on Schedule C, not on Schedule A. We disagree. Tax preparation

fees generally are deductible as a Schedule A expense.  Sec. 212(3); sec. 1.212-1(1), Income Tax Regs.; sec. 1.67-1T(a)(1)(iii), (b), Temporary Income Tax Regs., 53 Fed. Reg. 9875 (Mar. 28, 1988).  Petitioners have not provided evidence that would enable us to find or estimate any portion of the fees that is allocable to petitioner husband's business.

We conclude that petitioners failed to prove that they may deduct advertising, rent, office expenses, utilities and telephone, commissions, supplies, licenses and fees, dues, rental maintenance, and insurance expenses in excess of the amounts allowed by respondent.  Petitioners' evidence that they could deduct these expenses consisted of the canceled checks and petitioner husband's testimony.  Petitioner husband did not explain the nature or necessity of some of the advertising and rental property repairs expenses, or the business purpose for these expenses.  He did not show that some insurance expenses had a business, rather than a personal, purpose.  Many of the disputed checks were payable to cash or to payees related to petitioners.  He did not show whether some of the license fees, rental maintenance, and insurance expenses related to Schedule C or Schedule E activities.  Petitioners also failed to meet the section 274 substantiation requirements for his club dues for Club Terrasini and the Italian American Cultural Society, and for promotional expenses for watches bearing the Soldi logo.  Except as stated in this opinion, petitioners have failed to convince us

that they may deduct any of the expenses in excess of those allowed by respondent.

8.  Net Operating Loss Carryforward

Section 172 allows a taxpayer to deduct net operating losses.

Respondent determined that petitioners did not have a net operating loss carryforward from 1987 to 1988 because respondent's adjustments to petitioner husband's 1987 Schedule C activity eliminated the claimed net operating loss. Petitioners attached to their brief appendix C, entitled "Loss Carry Forward 1987", which purports to be petitioners' calculation of their net operating loss for 1987. They did not include references to the record, as required by Rule 151(e)(3). Due to our conclusions about petitioners' unreported income, business expenses, rent expenses, and additional business deductions for 1987, we are not convinced that petitioners had a net operating loss for 1987. We sustain respondent's determination on this issue.

9.  Additions to Tax for Fraud Under Section 6653(b) and Penalty Under Section 6663(a)

a.  Background

Respondent determined that petitioner husband (but not petitioner wife) is liable for the addition to tax for fraud under section 6653(b) for 1988 and the fraud penalty under section 6663(a) for 1989. A taxpayer is liable for an addition to tax or penalty for fraud equal to 75 percent of the part of

the underpayment which is attributable to fraud.  Secs. 6653(b), 6663(a).

Respondent has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  First, respondent must prove the existence of an underpayment.  Parks v. Commissioner, 94 T.C. 654, 660 (1990).  Respondent may not rely on petitioners' failure to carry the burden of proof as to the underlying deficiency.  Id. at 660-661; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).  Second, respondent must show that petitioner husband intended to evade taxes he believed to be owing by conduct intended to conceal, mislead, or otherwise prevent tax collection.  Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968);  Parks v. Commissioner, supra at 661; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

b.    Underpayment

We conclude that respondent has clearly and convincingly proven that petitioner husband underreported tax for 1988 and 1989.

c.    Fraudulent Intent

Respondent must prove by clear and convincing evidence that petitioner husband had fraudulent intent.  Parks v. Commissioner, supra at 664.  For purposes of section 6653(b), fraud means actual, intentional wrongdoing, Mitchell v. Commissioner, 118 F.2d 308, 310 (5th Cir. 1941), revg. 40 B.T.A. 424 (1939); i.e., the intentional commission of an act for the

specific purpose of evading a tax believed to be owing, Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81.  Fraud may be proven by circumstantial evidence because direct evidence of the taxpayer's intent is rarely available. Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

Respondent argues that the following badges of fraud are present in this case:  A pattern of unreported income, failure to keep books and records, concealment of income, and false statements to revenue agents.  We disagree that the evidence is sufficient to clearly and convincingly show that petitioner husband fraudulently underreported income in 1988 and 1989.  We recognize that he could not accurately reconstruct income for those years from his books and records, but we are not persuaded that he underreported his income due to fraud, rather than carelessness or negligence.

Respondent alleges that petitioner husband did not have a bank account in his name.  Respondent's allegation is not entirely correct; petitioner husband had an account in his name at First State Bank in 1987.  Also, Respondent points out that petitioner husband deposited his income in Canta's and petitioner wife's bank accounts, that in 1988 he cashed two commission checks totaling $14,622, and that he gave his return preparer only the 1988 commission income documented by Forms 1099. However, we do not believe petitioner husband's use of those bank

accounts was fraudulent.  He deposited all of his receipts, including the two commission checks he cashed in 1988, in bank accounts, several of which bore his Social Security number.  We do not think that he was trying to hide his income or ownership of the accounts.

Respondent points out that petitioner husband did not keep books and records for his real estate business in 1988 and 1989.  However, as stated above, we do not believe that he intended to defraud.  Instead, we think he did not keep books and records other than his checks because he was disorganized and because he could not afford accountants.  See Compton v. Commissioner, T.C. Memo. 1983-647.

Respondent points out that petitioner husband deposited checks from Soldi in Premiere's and Canta's out-of-state bank accounts.  Petitioner husband admitted that he routinely transferred funds between accounts.  He did this to create a float on these funds.[12]  It was not an attempt to hide his income.

Respondent points out that petitioner husband used business bank accounts to pay personal expenses, and that he deposited commission checks in the Homeowners account rather than in a personal account in 1989.

---

[12]  A float exists when checks that have been credited to the depositor's bank account have not yet been debited to the drawer's bank account.  This often permits the interest-free use of funds during the brief period before the checks are debited to the drawer's account.  Black's Law Dictionary 640 (6th ed. 1991).

Respondent points out that petitioner husband deposited more than $23,000 in checks payable to Soldi in other accounts he controlled. Respondent argues that he tried to conceal commissions by making Soldi commission checks payable to petitioner wife. We disagree. We do not think this was an attempt to conceal income because the Soldi checks that petitioner husband wrote to petitioner wife were deposited to the local Canta bank account that petitioner husband regularly used and on which he was the signator. We do not believe that petitioner husband diverted checks from Soldi to hide them from the Government. Rather than depositing the checks to Soldi's account, he deposited commissions he had earned to accounts that he regularly used and on which he was the signator. We think the fact that he left a record by depositing the checks is a factor that negates the inference that he was trying to conceal income from the Government.

Respondent argues that petitioner husband concealed information from his preparers. We disagree. Petitioner husband did not intentionally conceal information from the return preparers; he did not have records to give them to accurately prepare the returns. We are not persuaded that his lack of records was due to fraud rather than negligence.

Respondent argues that petitioner husband did not cooperate with respondent's agents, and made false statements to a revenue agent. Respondent claims that petitioner husband told the

revenue agent that he maintained separate bank accounts for personal and business activities.  We do not find that petitioner husband made false statements to a revenue agent.  Petitioner husband's business and banking activities were disorganized and he did not properly keep separate accounts for business and personal activities.  We are persuaded that petitioner husband's statement, while mistaken in part, was not intentionally false or misleading.

Respondent points out that petitioner husband wrote checks to Americana investors and noted on the checks that they were commissions.  Similarly, respondent claims that petitioner husband falsified business expenses by misrepresenting the purpose of the payments on the checks and on schedules he gave to respondent.  We disagree.  We think this is another example of petitioner husband's failure to keep records and the disorganized state of his business affairs.  We do not find that petitioner husband intentionally made false or misleading statements to respondent's agents, or that he was uncooperative with respondent's agents.

Respondent's counsel and petitioners' counsel worked hard to reconstruct petitioners' finances.  Respondent contends that this shows the extent of petitioner husband's efforts to conceal his financial affairs.  We disagree.  We think it shows petitioners' belated cooperation with respondent's agents in attempting to get to the bottom of petitioner husband's finances.

While petitioners underreported some income and capital loss, we are not convinced that it was due to fraud. It appears that the underreporting was due to careless bookkeeping and petitioners' difficult personal and financial circumstances, which was negligent, but not fraudulent.

We conclude that respondent has not proven by clear and convincing evidence that petitioner husband is liable for the addition to tax for fraud under section 6653(b) for 1988 or the penalty for fraud under section 6663(a) for 1989.

10. Additions to Tax

a. Late Filing

Petitioners filed their 1987 and 1989 returns late. A taxpayer is liable for an addition to tax of up to 25 percent for failure to timely file a Federal income tax return unless the taxpayer shows that the failure was due to reasonable cause and not willful neglect. Sec. 6651(a)(1). Petitioner bears the burden of proving that his failure to file a timely return is due to reasonable cause and not willful neglect. United States v. Boyle, 469 U.S. 241, 245 (1985); Baldwin v. Commissioner, 84 T.C. 859, 870 (1985); Davis v. Commissioner, 81 T.C. 806, 820 (1983), affd. without published opinion 767 F.2d 931 (9th Cir. 1985). To prove reasonable cause, a taxpayer must show that he exercised ordinary business care and prudence but nevertheless could not file the return when it was due. Crocker v. Commissioner, 92

T.C. 899, 913 (1989); sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Petitioners argue that they had reasonable cause for filing their 1987 return late because petitioner husband believed that he had no tax liability for 1987 in view of his financial difficulties and bankruptcy. They contend that they had reasonable cause for filing their 1989 return late because their infant son Antonino was gravely ill in 1989, was hospitalized and had heart surgery in April 1990, and died in August 1990.

Illness of a taxpayer or member of his or her immediate family may be reasonable cause for late filing if the taxpayer shows that he or she cannot file a timely return because of such illness. Williams v. Commissioner, 16 T.C. 893, 906 (1951); Hayes v. Commissioner, T.C. Memo. 1967-80. While incompetence, mental illness, alcoholism, or other incapacity may excuse a taxpayer from late filing, a taxpayer's selective inability to meet his tax obligations when he can conduct normal business activities does not excuse his late filing or failure to file. Kemmerer v. Commissioner, T.C. Memo. 1993-394; Bloch v. Commissioner, T.C. Memo. 1992-1; Bear v. Commissioner, T.C. Memo. 1992-690, affd. without published opinion 19 F.3d 26 (9th Cir. 1994); Fambrough v. Commissioner, T.C. Memo. 1990-104.

Petitioner husband had business and financial problems during the time petitioners should have filed their tax return for 1987. However, he continued to operate his real estate

business.  The fact that he actively engaged in real estate activities throughout this period, we believe, shows that his financial difficulties did not prevent him from filing their 1987 tax return on time.  We find that petitioners' failure to timely file the 1987 return was not due to reasonable cause.  Therefore, we find that they are liable for the addition to tax under section 6651(a)(1) for 1987.

Respondent argues that, despite petitioners' personal problems resulting from Antonino's tragic illness and death, petitioner husband was not ill and was able to carry on his business activities in 1989.  We disagree.  Petitioners' son had heart surgery in April 1990, around the time that their 1989 return was due to be filed.  He was hospitalized until late July. Petitioners were at the hospital with him continuously during these 4 months.  Petitioners' son died in August 1990, and they filed their 1989 return in October 1990.  We are convinced by these facts that petitioners' late filing of their 1989 return was due to reasonable cause and not willful neglect.  We hold that they are not liable for the addition to tax under section 6651 for 1989.

b.  Negligence

Respondent determined that petitioners are liable for the addition to tax for negligence under section 6653(a)(1)(A) and (B) for 1987, and under section 6653(a)(1) for 1988, and the negligence penalty under section 6662(b)(1) for 1989.

Petitioners have the burden of proving that they were not negligent.  Neely v. Commissioner, 85 T.C. 934, 947 (1985).

Section 6653(a)(1)(A) (and section 6653(a)(1)) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules or regulations.  Section 6653(a)(1)(B) imposes an additional liability of 50 percent of the interest due on the underpayment of tax attributable to negligence or intentional disregard of rules or regulations.  Beginning in 1989, taxpayers are liable for a penalty equal to 20 percent of the part of the underpayment attributable to negligence.  Secs. 6662(a), (b)(1). Negligence includes a failure to make a reasonable attempt to comply with the provisions of the Internal Revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return.  Sec. 6662(c).  Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances.  Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner, supra.

Petitioners argue that petitioner husband reasonably believed that he had no taxable income in 1987, and that in fact, if his personal activities are combined with Americana's, he had a net operating loss for the year.

Petitioners contend that petitioner husband's income in 1988 was nominal since they had no taxable gain on the sale of their

home until they decided whether they would buy a replacement home and roll over the gain. They further contend that they had no taxable income in 1988 after deducting itemized deductions, losses on the sale of real estate, and a loss carryforward from 1987.

Finally, petitioners maintain that any inaccuracies on the 1989 return occurred because their child was seriously ill and had heart surgery in April 1990, when the 1989 return was due. They argue that they are not liable for the accuracy related penalty for 1989 because loss carryforwards eliminate any tax liability for 1989.

We disagree. We believe that petitioners' tragic difficulties with Antonino excuse the lateness of the 1989 return, but not its inaccuracies. Petitioner husband did not have books and records showing his sales, commissions, etc., or other information relating to the operation of his businesses. Petitioners substantially underreported their income and overreported their deductions for each of the years in issue. We find that petitioners' underpayments of tax in 1987, 1988, and 1989 were due to negligence because they failed to keep adequate records. Gilman v. Commissioner, 72 T.C. 730, 751 (1979).

c. Substantial Understatement

The next issue for decision is whether petitioners are liable for the addition to tax for substantial understatement of income tax under section 6661(a) for 1987 and 1988. Section

6661(a) provides for an addition to tax in the amount of 25 percent of the amount of any underpayment attributable to a substantial understatement of income tax.

An understatement is the amount by which the correct tax exceeds the tax reported on the return. Sec. 6661(b)(2)(A). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000. Sec. 6661(b)(1)(A). Petitioners bear the burden of proving that the addition to tax under section 6661 does not apply. Rule 142(a); Tweeddale v. Commissioner, 92 T.C. 501, 506 (1989).

If a taxpayer has substantial authority for the tax treatment of any item on the return, the understatement is reduced by the amount attributable to it. Sec. 6661(b)(2)(B)(i). Similarly, the amount of the understatement is reduced for any item adequately disclosed either on the taxpayer's return or in a statement attached to the return. Sec. 6661(b)(2)(B)(ii). Neither of these exceptions applies here.

Petitioners argue that they did not substantially understate their income for 1987 if all deductions and economic losses are allowed for that year. They also argue that there was no substantial understatement for 1988 because the tax liability for 1988 is not substantial.

Petitioners omitted large amounts of income from their 1987 and 1988 joint returns, which caused substantial

understatements of income tax.  Petitioners underreported their income by about $47,068 in 1987 and $87,711 in 1988.  Petitioners have cited no authority for their failure to report those items of income.  We sustain respondent's determinations that petitioners are liable for the addition to tax under section 6661 for 1987 and 1988.

11.  Whether Petitioner Qualifies as an Innocent Spouse

    a.  Background

We next decide whether petitioner wife qualifies as an innocent spouse under section 6013(e).

Spouses who file joint tax returns generally are jointly and severally liable for tax.  Sec. 6013(d)(3).  Petitioner argues that she is not liable for the deficiencies and addition to tax for substantial understatement of income tax because she is an innocent spouse under section 6013(e).  To qualify as an innocent spouse, petitioner must prove that:  (i) She filed a joint return for the years in issue; (ii) there is a substantial understatement of income tax attributable to grossly erroneous items of the other spouse on the return; (iii) she did not know or have reason to know of the substantial understatement when she signed the return; and (iv) it would be inequitable to hold her liable for the deficiency attributable to the substantial understatement.  Sec. 6013(e)(1).  Failure to meet any of these requirements precludes a taxpayer from qualifying as an innocent spouse.  Sec. 6013(e)(1); Purcell v. Commissioner, 826 F.2d

470, 473 (6th Cir. 1987), affg. 86 T.C. 228 (1986); Shea v. Commissioner, 780 F.2d 561, 565 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310. The innocent spouse exception is construed in view of the congressional purpose of protecting innocent taxpayers from injustice. Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975).

Respondent concedes that petitioner meets all of the requirements to qualify as an innocent spouse under section 6013(e) except whether she knew or had reason to know of the understatements when she signed the returns, and whether it is inequitable to hold her liable.[13] We need not decide whether petitioner wife knew or had reason to know of the understatements because we conclude that it is not inequitable to hold her liable.

b. Inequitable to Hold Petitioner Liable

To be entitled to relief as an innocent spouse, petitioner wife must show that it would be inequitable to hold her liable for the deficiencies in tax for the years in issue. Sec. 6013(e)(1)(D).

In deciding whether it is inequitable to hold a spouse liable for a deficiency, we consider whether the purported innocent spouse significantly benefited beyond normal support,

---

[13] Respondent also points out that respondent disallowed some of petitioners' deductions for lack of substantiation, and deductions disallowed merely for lack of substantiation are not grossly erroneous items.

either directly or indirectly, from the unreported income.
Hayman v. Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg.
T.C. Memo. 1992-228; Belk v. Commissioner, 93 T.C. 434, 440
(1989); Purcell v. Commissioner, 86 T.C. at 242; H. Rept. 98-432
(part 2), at 1501, 1502 (1984); sec. 1.6013-5(b), Income Tax
Regs.  Normal support is determined by the circumstances of the
taxpayers.  Sanders v. United States, 509 F.2d at 168; Estate of
Krock v. Commissioner, 93 T.C. 672, 678 (1989); Flynn v.
Commissioner, 93 T.C. 355, 367 (1989).

Petitioners argue that petitioner wife did not benefit from
the substantial understatement of income by petitioner husband
or receive substantial amounts from petitioner husband in the
years at issue.  Petitioners point out that petitioner wife owned
the home in which petitioners lived and she owned a home on
LaGrange which she sold in 1987.  Her net cash proceeds were
$23,562, $14,848 of which she deposited in her household account.
She also received $64,482 from the sale of her home in 1988,
which she deposited in her own account.

Petitioner wife benefited from the understatements on
petitioners' 1987, 1988, and 1989 returns.  Petitioner wife had
wages of $15,500 in 1987, $10,200 in 1988, and none in 1989, and
therefore depended on petitioner husband for her support.  In
1987 and 1988 petitioner husband deposited funds in her bank
accounts which she used to pay household expenses.  In 1989,
petitioner husband used the Premiere and Canta corporate accounts

to pay many of petitioners' personal, living expenses.  Also, given petitioner wife's modest income in these years, she must have used petitioner husband's unreported income to buy the Tanglewood home for $175,000 in 1987, and to build the Alden home for $160,000 in 1989.

We believe that petitioner wife fully benefited from the omitted income.  We believe that she fully shared in the tax savings from the omitted income and that the understatements let her maintain a standard of living that she would not have enjoyed otherwise.  See Scarafile v. Commissioner, T.C. Memo. 1991-512.

To reflect the foregoing,

Decision will be entered under Rule 155.